**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **TOYIA VINSON and TRISHA JAN BROWN,** | |
| *Plaintiffs,* | |
| **v.** | |
| **MACON-BIBB COUNTY; SAMUEL "WADE" MCCORD, in his individual and official capacity as the Tax Commissioner and former Assistant Tax Commissioner; and THOMAS TEDDERS, in his individual and official capacity as the former Tax Commissioner,** | **CIVIL ACTION NO.** **5:18-cv-00306-TES** |
| *Defendants.* | |

**ORDER GRANTING DEFENDANTS' AMENDED**
**MOTION FOR SUMMARY JUDGMENT**

African-American Plaintiffs Toyia Vinson and Trisha Jan Brown allege that their

employers, Defendants Samuel "Wade" McCord and Thomas Tedders, the current and

former tax commissioners, respectively, for Macon-Bibb County, violated their rights

under 42 U.S.C. § 1981 guaranteed by the Equal Protection Clause of the Fourteenth

Amendment to the United States Constitution and Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").[1] Initially, Plaintiffs brought failure-to-promote claims as well as claims for unequal pay, discriminatory pay raises, and retaliation, but the Court previously dismissed their failure-to-promote claims as well as all claims asserted against Macon-Bibb County. *See* [Doc. 21 at pp. 5–7, 10–14]. Now, with the benefit of discovery, Defendants argue that they are entitled to summary judgment on the remaining claims for unequal pay, discriminatory pay raises, and retaliation. For the reasons stated below, the Court agrees and **GRANTS** their Amended Motion for Summary Judgment [Doc. 44].

## FACTUAL BACKGROUND

The facts of this case are simple and straightforward, but they are chock-full of numerical values related to the salaries of three women: Toyia Vinson, Trisha Brown and Thelma Bass.

Plaintiffs Toyia Vinson and Trisha Brown are both African American. [Doc. 48-9 at ¶ 1]. Vinson began her employment with the Macon-Bibb County Tax

---

[1] *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) (stating that "[w]here, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under [42 U.S.C. §§ 1981 and 1983], the legal elements of the claims are identical . . . [and] [the Court] need not discuss . . . Title VII claims separately" from claims brought under §§ 1981 and 1983.).

Further, § 1981 claims may only be brought pursuant to 42 U.S.C. § 1983 given that the alleged violators, two county tax commissioners, acted under color of state law. Section 1983 exists to remedy the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" and "provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." *Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991). Stated another way, state actors cannot be sued for constitutional violations outside the purview of § 1983 and Plaintiffs' claims under §§ 1981 and 1983 effectively merge. *Butts v. Cty. of Volusia*, 222 F.3d 891, 894 (11th Cir. 2000).

Commissioner's Office as a Tax Office Clerk Trainee on January 16, 1993, and "worked [her] way up through the various Accountant Clerk positions to the Accountant Clerk III position, which [she has] held for over [ten] years." [*Id.* at ¶ 2]; [Doc. 48-7, Vinson Decl., ¶ 1].  Brown began her employment as a Tax Clerk Trainee on October 16, 2000, and she has also been promoted to the Accountant Clerk III position. [Doc. 48-9 at ¶ 3]; [Doc. 48-8, Brown Decl., ¶ 3].[2] And on April 21, 2014, Thelma Bass, a white woman, "began work . . . in the Staff Accountant position" in the Accounting Department of the Tax Commissioner's Office. [Doc. 48-9 at ¶ 4]; [Doc. 44-3, McCord Aff., ¶ 13]. Vinson and Brown base their race discrimination claims on what they believe to be unequal pay, discriminatory pay raises, and retaliation. So, what were the salaries in question? It all begins in 2014.

In April 2014, Bass began her employment at an annual salary of $39,811.20, Vinson earned $44,782.40, and Brown earned $36,816.00. [Doc. 48-9 at ¶¶ 10–12]. In July 2015, the Macon-Bibb County Commission approved a new pay scale after the City of Macon and Bibb County consolidated their governments. [*Id.* at ¶ 13]; *see, e.g.,* [Doc. 44-4, Tedders Aff., pp. 60, 63, 95]. At Tedders' request, McCord (then a deputy tax commissioner) and another deputy commissioner worked with the Macon-Bibb County

---

[2] Despite their clear admissions to these promotions in their respective Declarations, Plaintiffs state in briefing that they "have sought promotions and raises" throughout their employment with the Tax Commissioner's Office and "have been and continue to be victims of racially discriminatory animus." *See* [Doc. 48-7] and [Doc. 48-8] *in connection with* [Doc. 48-1 at p. 2]. To the extent Plaintiffs contend in briefing that they have not received a single promotion since their employment with the Tax Commissioner's Office, such a contention is obviously belied by their own evidence.

Human Resources Department to implement the new pay scale. [Doc. 44-3, McCord Aff., ¶¶ 4, 18]; [Doc. 44-4, Tedders Aff., ¶¶ 30–31]. With the help of some Macon-Bibb County officials, the Middle Georgia Regional Commission performed a salary study. [Doc. 44-3, McCord Aff., ¶ 18]. The study examined several "local government entities of comparable size and . . . population[ ]" and focused on "other consolidated or unified governments" like Macon-Bibb. [*Id.*]. Importantly, Defendants "relied . . . on the methodology used by the [Middle Georgia] Regional Commission" to bring the salaries into line with similar local governments. [*Id.*]. To better explain this new pay scale, Tedders' affidavit says clearly that it was "not based on merit or job performance or time in service." [Doc. 44-4, Tedders Aff., ¶ 32]. "Each individual employee was placed on the new pay scale in" a previously determined "position grade" linked to that employee's "position of employment." [*Id.*]. "[S]ome positions placed on the scale saw small adjustments upward while others saw larger adjustments upward," but no one took a salary cut. [*Id.*]. Under the new pay scale, both Vinson and Bass earned $44,865.60, while Brown's annual salary increased to $36,857.60. [Doc. 48-9 at ¶¶ 13–15]; *see also* Discussion, Section (B)(2), *infra*.

One year later, all Macon-Bibb County employees and employees of constitutional officers and independent elected officials, which included Plaintiffs, received a 1.5% cost-of-living adjustment to their respective salaries. [Doc. 48-9 at ¶ 16]. As a result of this adjustment, Vinson and Bass's annual salary jumped to $45,531.20,

and Brown's moved to $37,419.20. [*Id.*]. Then, in October 2018, the county commissioners approved another salary increase for the Tax Commissioner's Office—this time, a 4%, department-wide increase that included Bass and Plaintiffs. After the 4% increase, Vinson and Bass both made $47,361.60, while Brown's salary increased to $38,916.80. [*Id.* at ¶¶ 17–18]; [Doc. 44-3, McCord Aff., ¶ 49].

In an effort to easily illustrate the relevant salaries and various pay raises that Vinson and Brown received in comparison to Bass, the Court made the following chart:

|  | Bass | Vinson | Brown |
|---|---|---|---|
| April 2014 | $39,811.20 | $44,782.40 | $36,816.00 |
| July 2015 | $44,865.60 | $44,865.60 | $36,857.60 |
| July 2016 | $45,531.20 | $45,531.20 | $37,419.20 |
| October 2018 | $47,361.60 | $47,361.60 | $38,916.80 |

Breaking these salaries down even further, Vinson's annual salary increased $83.20 between the April 2014 starting point and the July 2015 salary increase (brought about by the consolidated government's new county-wide pay scale). [Doc. 48-2 at ¶ 26]. Similarly, Brown's annual salary increased by $41.60. [*Id.*]. However, the county's new pay scale gave Bass an annual increase of $5,054.40. [*Id.*]. As Tedders indicated, each individual raise corresponded with that employee's particular and specific "position grade," and, unlike Plaintiffs who occupied "clerical positions," Bass's grade

was characterized as a "technical position." *See, e.g.*, [Doc. 44-4, Tedders Aff., ¶ 32]; *see also* [Doc. 44-3, McCord Aff., ¶¶ 13, 15].

The 2016 salary increase provided all employees with an equal cost-of-living adjustment—1.5%. [Doc. 48-9 at ¶ 16]. Doing the math, Vinson and Bass's salary each increased $665.60 annually, while Brown's annual salary increased by $561.60. [Doc. 48-2 at ¶ 27].[3] Finally, with regard to the salary increases for the Tax Commissioner's Office in October 2018, both Vinson and Bass's yearly salary increased $1,830.40, and Brown's went up by $1,497.60. Again, the Court finds the following chart to be helpful:

|  | Bass | Vinson | Brown |
|---|---|---|---|
| July 2015 Salary Increase | $5,054.40 | $83.20 | $41.60 |
| July 2016 Salary Increase | $665.60 | $665.60 | $561.60 |
| October 2018 Salary Increase | $1,830.40 | $1,830.40 | $1,497.60 |

These charts clearly show that Brown always earned less than Bass, but Vinson always made the same, if not more, than Bass—from April 2014 through the 4% department-wide salary increase in October 2018. This begs the question: Given that Vinson never made less than Bass, how could she possibly say that she was treated unequally? She can't. *See Walker*, *infra*. It appears that Vinson's issue stems from her 21-year seniority, the disproportionate raise distribution considering that seniority, and a comparison of

---

[3] In their Statement of Material Facts, Plaintiffs indicate that Brown's salary increased by $562.20 after the cost-of-living adjustment. [Doc. 48-2 at ¶ 27]. However, Brown's salary increase was actually $561.60.

the amount of work she and Bass performed in conjunction with the equal salaries they received.

## DISCUSSION

### A.   Standard of Review

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] "When the nonmoving party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material negating the opponent's claim[]' in order to discharge this 'initial responsibility.'" *Four Parcels of Real*

---

[4] Courts may consider all materials in the record, not just those cited by the parties. Fed. R. Civ. P. 56(c)(3).

*Prop.*, 941 F.2d at 1437–38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Rather, "the moving party simply may show—that is, point out to the district court—

that there is an absence of evidence to support the nonmoving party's case." *Id.* (cleaned

up). Alternatively, the movant may provide "affirmative evidence demonstrating that

the nonmoving party will be unable to prove its case at trial." *Id.*

The burden then shifts to the nonmoving party, who must rebut the movant's

showing "by producing . . . relevant and admissible evidence beyond the pleadings."

*Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing

*Celotex Corp.*, 477 U.S. at 324). The nonmoving party does not satisfy its burden "if the

rebuttal evidence 'is merely colorable[ ] or is not significantly probative' of a disputed

fact." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). "A mere scintilla of evidence

supporting the [nonmoving] party's position will not suffice." *Allen v. Tyson Foods, Inc.*,

121 F.3d 642, 646 (11th Cir. 1997). Further, where a party fails to address another party's

assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact

undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). However, "credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences

from the facts are jury functions, not those of a judge. *Anderson*, 477 U.S. at 255. Stated

differently, "the judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.

"The evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

**B.     Race-Based Discrimination**

In addition to a claim of retaliation, Plaintiffs assert that Defendants violated Title VII and the Constitution by discriminating against them on the basis of their race with regard to their salaries and pay raises. [Doc. 48-1 at p. 9]. As detailed below, the Court finds that Defendants violated neither.

**1.     Burden Shifting Under *McDonnell Douglas***

Plaintiffs' reliance on circumstantial evidence to support their unequal pay and retaliation claims first places the analysis within the familiar burden-shifting framework set out in *McDonell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5] Under this framework, Plaintiffs bear the initial burden of establishing a prima facie case of wage discrimination based on race. *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc).

**a.     Unequal Pay Claims**

To make a case for unequal pay, Plaintiffs must show that they belong to a racial minority, or stated differently, a protected class; (2) that they received low wages; (3)

---

[5] However, Plaintiffs ask the Court to analyze their claims for "discriminatory pay raises" under a convincing mosaic theory. [Doc. 48-1 at pp. 12–15 (discussing Plaintiffs' discriminatory pay raises and "ask[ing] the Court to apply the convincing mosaic theory to infer discrimination."]; *see also* Discussion, Section (B)(2), *infra*.

that similarly-situated comparators outside of their protected class received higher compensation; and (4) that they were qualified to receive a higher wage." *Cooper v. S. Co.*, 390 F.3d 695, 734–35 (11th Cir. 2004), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). As for the third prong, Plaintiffs and their comparator must be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1218. If Plaintiffs can succeed in making their prima facie case, the burden shifts to Defendants "to articulate a legitimate, nondiscriminatory reason for [their] actions." *Id.* at 1221. "Finally, should [Defendants] carry [their] burden, [Plaintiffs] must then demonstrate that [Defendants'] proffered reason was merely a pretext for unlawful discrimination." *Id.*

### i.    *Plaintiff Vinson's Unequal Pay Claim*

In the Eleventh Circuit, a plaintiff is required "to present a comparator who *received higher compensation* in order to establish a prima facie case" for race-based wage discrimination. *Walker v. Fulton Co. Sch. Dist.*, 624 F. App'x 683, 686 (11th Cir. 2015) (emphasis added). Here, at the relevant times discussed in this lawsuit, Vinson received a salary that was more than or equal to her proffered comparator's. Therefore, Vinson's unequal pay claim fails because she did not present a valid comparator who received *higher* compensation than her. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment on this claim.

### ii.    Plaintiff Brown's Unequal Pay Claim

Now, the Court turns to Brown's unequal pay claim. Undoubtedly, like Vinson, Brown is a member of a protected class, but she received *lower* wages than Bass, her comparator. Thus, the outcome of Brown's unequal pay claim hinges on two questions: (1) whether she and Bass are similarly situated in all material respects such that Bass, as an individual outside of Brown's protected class, should not receive a higher compensation and (2) whether Brown was qualified to receive the higher wage. *Cooper*, 390 F.3d at 734–35.

Upon review of the record, the Court finds that Brown has not established a prima facie case of race discrimination because she failed to point to a similarly-situated comparator outside of her protected class who was paid more than she was. Yes, Bass has always earned more than Brown, but the two are not similarly situated in all material respects as required by *Lewis.* This deficiency requires summary judgment in favor of Defendants on Brown's unequal pay claim.

To begin, Defendants contend that Bass is not a valid comparator because she and Brown had different levels of experience or different accounting backgrounds. [Doc. 44-1 at pp. 17–19]. Plaintiffs maintain that such a narrow focus on their different employment and accounting backgrounds is incorrect. [Doc. 48-1 at pp. 11–12]. Instead, Plaintiffs urge the Court to consider the fact that Brown and Bass were doing the work duties of an Accounting Clerk III from the time that Bass was hired through mid-2018.

[Doc. 48-1 at p. 11]. In other words, Brown stresses that she and Bass were doing the exact same work, but Bass merely "had a better job title" and, therefore, earned more pay. [*Id.*].[6] Brown argues that this single, superficial difference in job title places "only form over substance" and is not, by itself, dispositive on the issue of whether Bass is a valid comparator. [*Id.*].

On this point, Brown's right: "differences in job ranks between a plaintiff and another employee are not, in and of themselves, dispositive as to whether the two individuals may be compared for purposes of evaluating a discrimination claim." *Rioux v. City of Atlanta*, 520 F.3d 1269, 1281 (11th Cir. 2008) (citing *Lathem v. Dep't of Children and Youth Servs.*, 172 F.3d 786, 793 (11th Cir. 1999)). However, the Eleventh Circuit Court of Appeals has previously affirmed a district court's ruling that a proffered comparator's "highly valued" prior work experience[7] can strip the individual of that "comparator" label. *Crawford v. Carroll*, 529 F.3d 961, 974–75 (11th Cir. 2008). As for Bass, she possessed "extensive work experience in account reconciliation, posting, and

---

[6] To the extent Plaintiffs attempt to backdoor or resurrect their previously dismissed failure-to-promote claims by stating that they "have raised a factual dispute as to whether Bass was even qualified for the position [or] possessed the requisite skill set to perform the work assigned to her," the Court has already disposed of that claim in a previous Order and will not permit them to relitigate it via their Response [Doc. 48-1] to Defendants' summary judgment motion. [Doc. 48-1 at p. 11]; [Doc. 21 at pp. 10–14].

[7] By way of an example, two federal law clerks, one African American and the other white, can begin their clerkships on the exact same day, assume identical tasks, and equally divide the judge's caseload. But because the African-American law clerk came to the job with more years of prior legal experience, he (or she) is legally paid more than the white law clerk because that is what the relevant pay scale requires. As discussed later, the differences in salary and pay raises in this case came from the pay scale and had nothing to do with Plaintiffs' race.

billing," all of which were "similar to the job duties required to be performed in the Staff Accountant position." [Doc. 44-3, McCord Aff., ¶ 11]. While this readily-apparent distinction could invalidate Bass's status as a comparator, it is not the sole basis for the Court's decision. What is more helpful in making this determination is comparing the day-to-day job duties between Brown and Bass.

"Before Bass started in the [Tax Commissioner's Office], [Brown] was responsible for doing daily deposits, posting in the general ledger, reconciling cashier drawers, handling customers calls, and refunding checks." [Doc. 48-8, Brown Decl., ¶ 8]. Then, in September 2016, McCord hired Robert Edwards as Deputy Commissioner of Accounting Operations. [Doc. 44-6, Edwards Aff., ¶¶ 3–4]. Edwards testified that, at the time of his hire, Brown "was responsible for doing the daily deposit for property tax and garbage receivable collections, recording the activity in the general ledger through a cash receipts journal entry, . . . preparing refunds, and writing checks for refunds and overpayments." [Doc. 39, Edwards Depo., 27:16–21]. Bass, on the other hand, was "the primary person for doing the daily deposit for motor vehicle transactions, recording activity in the general ledger through a cash receipts journal, [and] preparing refund checks for overpayments for motor vehicle transactions." [*Id.* at p. 26:8–14]. Aside from the fact that Brown handled the property tax transactions and Bass handled the motor vehicle tax transactions, their duties for the most part appear quite comparable. However, as early as 2016, Bass also processed Title Ad Valorem Tax ("TAVT")

adjustments, a task that "sometimes involve[s] other counties[,]" and "assist[ed] with title registration receipts from vendors who process titles for car dealerships." [*Id.* at p. 26:15–21]; *see also* [Doc. 38, King Depo., p. 83:18–22 ("Well, the TAVT and - - TAVT refunds and the motor vehicle adjustment refunds were being done by [Bass]. The . . . adjustment refunds for property were being done by [Vinson].")]. Additionally, when the Tax Commissioner's Office "changed credit card companies" that handled "the back end of [its] credit card transactions, . . . the process of ensuring that the information was recorded correctly became more complex." [Doc. 39, Edwards Depo., p. 25:18–25]. This process was "delegated . . . to [Bass]" as it was "something" that Edwards decided was "appropriate for the staff accountant to take care of." [*Id.* at p. 26:1–4].

Indeed, the record demonstrates that Brown and Bass's duties may have been "fairly similar, but there were some differences." [Doc. 39, Edwards Depo., p. 27:22–25]. Plaintiffs never dispute the allegation that there were some differences, nor do they point out to the Court a time at which Brown also carried out TAVT transactions, assisted with title registration receipts, or maintained records comparable to those kept by Bass for credit card transactions. This alone is enough to show that Brown and Bass did not share the same day-to-day job duties.

While Bass, as a proffered comparator, does not have to be identical, she must be substantially similar to the point that she "cannot reasonably be distinguished." *Lewis*, 918 F.3d at 1227 ("[A] plaintiff and her comparators must be sufficiently similar, in an

objective sense, that they 'cannot reasonably be distinguished.'"). Even though the evidence shows that Brown and Bass had similar day-to-day job duties, the Court cannot determine, based on the differences illuminated by Defendants, that Bass is similarly situated to Brown in all material respects. Since Brown and Bass's job duties can be reasonably distinguished from one another, Brown failed to meet her burden of pointing to similarly-situated comparators who were treated more favorably. And without a prima facie case, no inference of discrimination arises.[8]

The second inquiry in our analysis for Brown's unequal pay claim—whether she was qualified to receive the higher wage—need not be discussed in light of her failure to present a valid comparator under *McDonell Douglas*. But, as discussed later, Brown has another avenue to try and prove her claim.[9]

---

[8] Again, it cannot be lost that Bass is a staff accountant and Brown is an accountant clerk. While Brown and Bass may certainly do some of the same work, it still matters that they have different job titles with differing responsibilities. For example, paralegals do a lot of the same work that lawyers do (some would correctly say more), but that doesn't mean that they get paid the same. Paraprofessionals often spend more direct time with children in the classroom, but they don't make as much as teachers.

[9] Since the existence of a comparator is not always essential in employment cases focusing on race discrimination, *McDonell Douglas*'s burden-shifting framework is not the only tool available to employees when arguing that their claim of intentional discrimination should survive summary judgment. When relying on circumstantial evidence to support race discrimination claims, a plaintiff can still win if she shows "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the [employer]." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

Based completely on how Plaintiffs present their arguments in briefing, the Court will discuss their claims in connection with a "convincing mosaic" theory below. *See* Discussion, Section (B)(2), *infra*. Before jumping into that analysis, the Court continues to address Plaintiffs' other claims falling under the *McDonnell Douglas* burden-shifting framework.

Having disposed of Plaintiffs' unequal pay claims via a *McDonnell Douglas* burden-shifting analysis, the Court turns to their retaliation claims.

### b.    Retaliation Claims

"A plaintiff alleging retaliation in violation of Title VII 'must begin by establishing a prima facie case; the plaintiff must show that (1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'" *Knox v. Roper Pump Co.*, --- F.3d ----, 2020 WL 2078291, at *5 (11th Cir. 2020) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997)). "These three elements create a presumption that the adverse action was the product of an intent to retaliate." *Id.* (quoting *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009)).

 Once a presumption of retaliation is established, the burden shifts to the defendant to rebut the presumption by articulating a legitimate, non-retaliatory reason for "the challenged employment action." *Id.* (first citing *Bryant*, 575 F.3d at 1308 and then citing *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)) (cleaned up). At this stage, the defendant's "burden is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it retaliated against the plaintiff." *Id.* (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

16

If the defendant has "met its burden of production and has proffered a legitimate, [non-retaliatory] reason for the adverse action," the presumption of retaliation is eliminated. *Knox*, 2020 WL 2078291, at \*5 (citing *Chapman*, 229 F.3d at 1024). Then, the plaintiff must "come forward with evidence allowing a reasonable factfinder to conclude that the proffered reason was pretextual." *Id.* "The plaintiff must 'come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Id.* (quoting *Combs*, 106 F.3d at 1528). "In determining whether a proffered reason is unworthy of credence, a court will consider 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action.'" *Id.* (quoting *Combs*, 106 F.3d at 1538).

Certainly, the Court recognizes that Defendants knew that—at the time of the events in this lawsuit—some job duties were not perfectly aligned with the corresponding job titles. [Doc. 39, Edwards Depo., p. 22:7–10]. That said, it is evident that Plaintiffs really want *the Court* to ham-handedly revamp the duties within the Tax Commissioner's Office and force reassignment of various task to Plaintiffs or add or remove certain responsibilities from Bass and other employees. Second-guessing those with the authority to make decisions within the Tax Commissioner's Office, however, is simply a task the Court is unwilling, or better yet, unable to undertake.

Before embarking on the analysis for Plaintiffs' retaliation claims, it must be remembered that courts do not sit as super personnel departments to review or implement change to an employer's business judgments. *McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 361 (1995) ("Title VII[ ] is not a general regulation of the workplace but a law which prohibits discrimination. [Title VII] does not constrain employers from exercising significant other prerogatives and discretions in the course of hiring, promoting, and discharging of their employees."). Under Title VII, no plaintiff can quarrel with or argue that their employer made a mistake or an unwise decision regarding their employment. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (discussing age discrimination under the Age Discrimination in Employment Act and explaining that "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason."); *Alexander v. Fulton Cty.*, 207 F.3d 1303, 1341 (11th Cir. 2000) (Title VII case) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not racially motivated."). In fact, the wisdom of an employer's business decisions is irrelevant "as long as those decisions were not made with discriminatory motive." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010) (citing

*Chapman*, 229 F.3d at 1030 (11th Cir. 2000)). The inquiry in a race discrimination case "is limited to whether the employer gave an honest explanation of its behavior." *Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)).

### i.    *Brown's Retaliation Claim*

Here, Brown claims that Defendants retaliated against her by allowing Edwards to take away some of her work duties. [Doc. 48-1 at pp. 15–17]. However, Defendants undeniably gave a legitimate non-discriminatory reason in responding to Brown's retaliation claim. Hired by McCord in September 2016, Edwards was charged with "applying [his] experience with information technology systems, equipment, and services to implement a number of efficiency-improvement and cost-saving measures" within the Tax Commissioner's Office. [Doc. 44-6, Edwards Aff., ¶¶ 3–4]. Edwards' affidavit explains that he changed Brown's job duties "for purposes of improving internal controls in keeping with professional accounting practices." [*Id.* at ¶ 8].

Obviously, Brown disagrees. She argues that Defendants "marginalize[d]" her and took "her work duties away from her."[10] [Doc. 48-1 at p. 17]. Specifically, Brown avers that that Edwards' "purported[,] legitimate[ ] business decision" to  "shift[ ] . . . duties within the office" is "flawed for many reasons." [Doc. 48-1 at p. 15]. But whether

---

[10] Given the circumstances of this case, the facts used to determine whether Bass was a valid comparator, *see* Discussion, Section (B)(1)(a)(ii), *supra*, for Brown's unequal pay claim and the facts underlying her retaliation claim are heavily interwoven.

a business decision is, by Brown's terminology, "flawed," doesn't matter; what does matter is if it was racially motivated. *See Alvarez, supra.*

Unequivocally, Brown's argument that Defendants' "*business decision* [was] flawed," is, as we know, legally insufficient to make a successful race discrimination claim. [Doc. 48-1 at p. 15] (emphasis added). While this is what she penned to paper in briefing, the Court, in order to give her the benefit of doubt, construes her word choice as a contention that Defendants' *argument* in opposition to her race discrimination claim—not their business decision—is flawed and disconnected. But, at the end of the day, this is just a distinction without a difference.

To demonstrate this alleged "flaw," Brown points out that Vinson "still handles both the incoming money and refunds for the motor vehicle division," but Edwards, "in keeping with professional accounting practices," decided that she (Brown) would not "handle both the incoming money and the refunds" for property taxes. [*Id.*]; [Doc. 44-6, Edwards Aff., ¶ 8]. To Brown, this "makes no sense." [Doc. 48-1 at p. 16]. By her argument, there is a disconnect "in terms of [the] organizational shift, to take work away from" Brown, but not Vinson. [*Id.*].

Clearly, Defendants' argument rests upon Edwards' business decisions, and Edwards' business decisions rests upon his experience, so it makes no difference (for purposes of determining liability for race discrimination) whether Defendants' argument or their discretionary business decision was flawed. All that matters is that

the employment decisions were not racially motivated. *Alexander*, 207 F.3d at 1341.

Certainly, "an employer's true motivation in an employment discrimination case [can

be] difficult to ascertain," but a plaintiff cannot survive summary judgment without

first establishing the all-important prima facie case. [Doc. 48-1 at pp. 16–17 (citing

*Hairston v. Gainesville Sun. Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993))]; *see also* [Doc. 48-1

at p. 17 (citing *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 148 (2000)) ("[A]

plaintiff's prima facie case, combined with sufficient evidence to find that the

employer's asserted justification is false," lends towards the creation of jury issues.)].

Looking at all of the evidence, this internal shifting of duties was a simple business

decision unmotivated by race. *See Reeves*, 530 U.S. at 2109 (stating that "the employer is

in the best position to put forth the actual reason for its decision"). Edwards testified

under oath, that "th[e] change in . . . Brown's job duties" was "[b]y no means" related to

her filing this lawsuit or to "any other activity on the part of . . . Brown in voicing

concerns or complaints about any aspect of her employment in the Tax Commissioner's

Office." [Doc. 44-6, Edwards Aff., ¶ 8].

　　　　From this, Brown has not "persuad[ed] the [C]ourt that a discriminatory reason

more [than] likely motivated [Edwards' actions]," nor have they—in the realm of a

pretextual argument—"show[n] that [Defendants'] proffered explanation[s] [are]

unworthy of credence." *See Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 256

(1981); [Doc. 48-1 at p. 17 (citing *Burdine*, 450 U.S. at 256) ("[S]ummary judgment is

generally unsuitable in cases where [a] plaintiff has established a prima facie case.")
(italics omitted)]. Brown offers no evidence of pretext in response; she just doesn't like
her boss's decision and thinks it makes no sense.[11] The lawful, discretionary, non-
racially motivated decisions made by the powers that be within the Tax Commissioners
Office—even though Brown may disagree with them—cannot and does not create
liability under Title VII for retaliation. Thus, the Court **GRANTS** summary judgment to
Defendants with regard to Brown's retaliation claim.

### ii.   *Vinson's Retaliation Claim*

Vinson first claims she was retaliated against on the basis of her race when
McCord informed her that she needed to remove her car from the parking lot reserved
for management. [Doc. 44-1 at p. 24]. According to Defendants, McCord enforced the
parking restrictions to other non-managerial employees as well, but once Vinson and
another white tax clerk provided a note from their doctors, he allowed both of them to
park in the manager parking lot. [*Id.*]. Vinson, however, apparently abandoned this
specific retaliation issue because she never addressed it in her Response [Doc. 48-1] to
Defendants' summary judgment motion. *See, e.g.*, [Doc. 48-1 at pp. 17–19]. Even if she
hadn't, she got what she wanted, and this simply just isn't an instance that could form a
retaliation claim.

---

[11] Should federal courts allow every employee who thinks their boss made a dumb decision to file a
federal suit, they would shortly be overrun.

Secondly, Vinson claims that Edwards, her direct supervisor, "cursed at her" once when she tried to discuss the workload distribution within the Accounting Department. [*Id.* at p. 18]. This retaliation issue is quickly dismissed. Vinson offers no context, no specifics, not even the word itself, nothing—except that Edwards "cursed" at her. The Court has no way of knowing whether she overheard Edwards cursing or whether he directed the unidentified curse word specifically at her. Likewise, Vinson fails to tell the Court if this was a rare occurrence or if Edwards routinely used foul language. She also doesn't tell the Court whether the curse word was in response to her filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").[12] Context always makes a difference. Here, we have the undressed assertion of cursing and that could mean many different things to many different people. But, without specifics, it is nearly impossible to determine if this alleged cursing incident rises to the point that it could support a retaliation claim.

Title VII, moreover, does not impose a general civility code in the workplace nor is it intended to make "the ordinary tribulations of the workplace" actionable. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238–39 (11th Cir. 2001) *overruled on other grounds by Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). Although it appears that Edwards cursed at Vinson "mere days" after learning that she filed her EEOC

---

[12] Since Vinson doesn't say, the Court assumes that the filing of her EEOC Charge is the specific protected activity that prompted Edwards' cursing.

Charge, she never indicates this happened more than once. Again, in order to win on retaliation, Vinson must demonstrate that she suffered a "materially adverse" change in the terms or conditions of her employment with the Tax Commissioner's Office. She simply must do more than make a perfunctory allegation that her supervisor cursed at her. *See, e.g.*, [Doc. 48-2 at ¶ 19]. Some indication of frequency, perhaps, but definitely an explanation of how Edward's actions could have materially and adversely affected a reasonable employee must be shown. There just isn't anything to show that her filing of the EEOC Charge *caused* Edwards to curse at her.

Perhaps Plaintiffs attempt to show some "materially adverse" effect by pointing out that after Vinson made complaints about discrimination, McCord "unfairly assigned her a large project," despite her already heavy workload. [Doc. 48-1 at p. 19]. Yet, she also states that McCord "took away some of [her] duties as a direct result" of her complaints about discrimination. [*Id.*]. The Court is, to say the least, befuddled as to how these facts create cognizable claims for race-based retaliation when it appears, from an objective standpoint, that Defendants' main reason for hiring Edwards was to ensure an equitable distribution of job duties within the Accounting Department. [Doc. 44-4, Edwards Aff., ¶ 4 ("From the beginning of my employment . . . McCord charged [Edwards] with applying [his] experience . . . to implement a number of efficiency-improvement and cost-saving measures . . . .")].

Nevertheless, the evidence fails to establish that Defendants retaliated against Vinson by reassigning some of her duties. Yes, Edwards may have assigned her a project larger than those to which she was accustomed, but there is no evidence that she "suffered [a] diminution in her title, salary, or benefits." *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (11th Cir. 1994). Receiving a "large project" or an increase in workload "describes nothing 'more . . . than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (quoting *Crady v. Liberty Nat'l Bank and Tr. Co.*, 993 F.2d 132, 136 (7th Cir. 1993)); [Doc. 48-1 at p. 19]. Once again, Edwards made these job reassignments based on his experience, exercising his business discretion and authority as the Deputy Commissioner of Accounting Operations for the Tax Commissioner's Office. Without more, the Court simply has no legal basis to second-guess or micromanage Defendants' internal business decisions.

Finally, Vinson's last retaliation issue arises out of an on-the-job injury from stubbing her toe on a door. [Doc. 44-1 at p. 25]; [Doc. 40, Vinson Depo., p. 167:5–13]. Notwithstanding the fact that she completed a personal injury report, Vinson claims that Defendants encouraged another employee who suffered a work injury to seek medical attention at the local occupational health facility, but they did not do that for her. [Doc. 40, Vinson Depo., p. 168:18–23]. At the time of her toe injury, the acting Assistant Tax Commissioner "was under the impression that very minor injuries which only required simple, self-administered [first-aid] measures did not require [Vinson] to

report to Macon Occupational Health for post-accident drug and alcohol testing." [Doc. 44-1 at p. 25]; *see also* [Doc. 44-5, Cherry Aff., ¶ 17]. Vinson, on the other hand, despite only treating her injury with a couple of Band-Aids and a few splashes of peroxide "to stop it from bleeding," contends that she "sustained a severe injury to her foot, not a minor injury," and that Defendants "did not aid her in the same way they aided a [similarly-situated] employee only a month prior." [Doc. 48-1 at p. 18]; [Doc. 40, Vinson Depo., pp. 167:22—168:7]. This "similarly-situated employee" is Cheryl Lee, and, by placing this label on Lee, Vinson is obviously under the mistaken impression that a comparator (used for a race discrimination claim) is needed to demonstrate retaliation. [Doc. 44-5, Cherry Aff., ¶ 17].

No—retaliation claims do not require the use of a comparator. Valid retaliation claims aren't, as Vinson suggests, comparisons of situations where one employee receives more care or attention for an on-the-job injury and the other receives less. The sole concern for retaliation is whether Defendants retaliated or ratified retaliatory acts motivated by race against Vinson *alone*. How Defendants handled Lee's on-the-job injury—a finger cut—is irrelevant. [*Id.*].

In order to state a retaliation claim, Vinson must show that Defendants only gave her a Band-Aid for her stubbed toe *because* she filed a lawsuit. Sure, the evidence shows that Vinson and Lee both suffered injuries that would not stop bleeding and that they received different treatment by Defendants—a Band-Aid for a toe injury and stitches to

close the cut on a finger. *See* [*id.* ("About two or three months prior to . . . Vinson's request for a Band Aid for her toe, another employee of the Tax Commissioner's Office, Cheryl Lee, had cut her finger at work and the bleeding reportedly could not be stopped. . . . Lee was escorted to Macon Occupational Medicine[13] by another employee . . . to quickly address the fact that the cut was continuing to bleed[.]")]; [Doc. 40, Vinson Depo., p. 168:10 (Vinson's toe "didn't stop bleeding.")]. However, as discussed below, Defendants' actions of dressing Vinson's toe injury with a Band-Aid cannot form the basis of a retaliation claim because of *when* Edwards found out that Vinson made discrimination complaints.[14]

Again, to state a retaliation claim, Defendants' actions must appear materially adverse to a reasonable employee and there must be some causal relation or connection, *see Grier*, *infra*, between Vinson's discrimination complaints and how Defendants handled her toe injury. Yes, Plaintiffs are correct in that protection against retaliation should be broader than protection against discrimination, but there still has to be some actual injury or harm. *See Burlington*, 548 U.S. at 67 ("The scope of [Title VII's]

---

[13] To provide some geographical context, Macon Occupational Health is literally right next door to the Macon-Bibb County Tax Commissioner's Office in downtown Macon, Georgia. [Doc. 44-5, Cherry Aff., ¶ 17 (stating that Macon Occupational Health is "in the next building over from the Tax Commissioner's Office on the same street")].

[14] In addition to her toe injury, Vinson claims that Lee was "advised of workers' compensation and told to go to the doctor associated with their policy." [Doc. 48-1 at p. 18]. Based on this, Vinson says that she was "extremely hurt to find out that she was misled . . . and treated differently than a coworker who had not . . . [filed] [a] . . . [c]harge" of discrimination against the Tax Commissioner's Office. [*Id.* at p. 19].

antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."). Here, Vinson complains that she wasn't personally escorted to receive some sort of medical attention for an injury that she herself treated with a couple of Band-Aids. The Court cannot justifiably place discriminatory, race-based fault on Defendants when Vinson could have—without any permission from Defendants—gone next door to seek her own medical attention.

Last, and most importantly, the time period, or in court-speak, the causal relation between Vinson's complaints of discrimination and her toe injury lands the final blow to this allegation of retaliatory conduct. In describing the timeline for this case's events, Vinson herself says that if you "[f]ast forward a few months," after Edwards cursed at her, you will arrive at her toe injury. [Doc. 48-1 at p. 18 ("Fast forward a few months, when Vinson sustained a severe injury to her foot . . . .")]. The Eleventh Circuit Court of Appeals has recognized that "courts have 'uniformly [held] that the temporal proximity must be very close.'" *Grier v. Snow*, 206 F. App'x 866, 869 (11th Cir. 2006) (quoting *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)) (citing with approval circuit court cases invalidating temporal proximities of three and four months). Temporal proximity between the protected activity (Vinson's discrimination complaints) and the purported adverse action (Defendants' response to Vinson's toe injury) "must be close in order to show a causal connection." *Grier*, 206 F. App'x at 869 (citing *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004)). A three-month interval between the protected activity and

the adverse action is too great, and, without more, cannot establish an inference of retaliation. *Id.* (citing *Higdon*, 393 F.3d at 1220) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

Here, Vinson admits that Edwards learned of the EEOC Charge in March 2018. [Doc. 48-2 at ¶ 19]. "Fast forward a few months," and Vinson testified that she injured her toe on August 24, 2018. [*Id.* at ¶ 22]; [Doc. 48-1 at p. 18]; [Doc. 40, Vinson Depo., p. 168:15–23]. That's five months later. Clearly, there is a substantial delay between Edwards learning of the EEOC Charge and Vinson's injury, and her retaliation claim related to Defendants actions regarding it, fails. Since there is such a temporal gap between the two activities, as shown by *Grier* and *Higdon*, there is no justification to apply *Burlington*'s more relaxed standard for Vinson's retaliation allegations. Accordingly, the Court **GRANTS** summary judgment to Defendants on Vinson's retaliation claim.

### c.    Discriminatory Pay Raise Claims

Plaintiffs also complain that Defendants, motivated by race, intentionally discriminated against them with respect to their pay raises. [Doc. 1 at ¶ 42]. But the evidence just isn't on their side.

As Defendants note and Plaintiffs do not dispute, this claim appears to be an attempt to make another run at the already-dismissed claims for unequal pay, disparate

pay, or wage discrimination. [Doc. 44-1 at p. 21 (Defendants' argument that "[t]here is

not a cognizable cause of action for 'discriminatory pay raises.'")]; [Doc. 48-1 at p. 14

(Plaintiffs' statement that "[t]he purpose and elements of the Equal pay Act[ ] are the

same as an unequal pay claim under Title VII, workers should be paid the same for the

same work.")].

As discussed above, to establish a prima facie case of disparate pay, Plaintiffs

must show that they occupy positions similar to that of a higher paid employee who is

not a member of their protected class. *Meeks*, 15 F.3d at 1019. The Court has already

determined (with respect to Brown) that Bass, because of her day-to-day job duties and

previous employment history, is not a proper comparator for purposes of straight

salary comparison for an unequal pay claim under a *McDonnell Douglas* burden-shifting

analysis. However, as to their claims regarding "discriminatory pay raises," Plaintiffs

urge the Court "to apply the convincing mosaic theory to infer discrimination." [Doc.

48-1 at p. 13]; *see also* n.9, *supra*.

### 2.      Convincing Mosaic

Even though Plaintiffs failed to present a valid comparator under *McDonnell*

*Douglas*'s burden-shifting framework, each of their claims (except for Vinson's claim for

unequal pay, *see* Discussion, Section (B)(1)(a)(i)), as briefly discussed above, still have a

chance of survival if they can *demonstrate*—that is, show to the Court—that a jury could

infer discriminatory intent from Defendants through a convincing mosaic.

"A 'convincing mosaic' may be shown by evidence that demonstrates, among other things, (1) 'suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn,' (2) systematically better treatment of similarly situated employees, and (3) that the employer's justification is pretextual." *Lewis*, 934 F.3d at 1185 (11th Cir. 2019) (quoting *Silverman*, 637 F.3d at 733–34). An example of a convincing mosaic is a situation where a plaintiff "point[s] to evidence that the paperwork in an investigation into racist emails explicitly identified employees by race and the employer fired all employees that the paperwork identified as white, but did not fire any of he black employees under investigation." *McGhee v. PPG Indus., Inc.*, No. 4:18-CV-244 (CDL), 2020 WL 1669849, at *6 (M.D. Ga. Apr. 3, 2020) (citing *Lockheed*, 644 F.3d 1336–46).

In this case, Plaintiffs "ask th[e] Court to analyze whether the record evidences a 'convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." [Doc. 48-1 at p. 6 (quoting *Lockheed*, 644 F.3d at 1328)]. Then, they dedicate nearly three pages of their brief to explain how a "convincing mosaic" analysis works, but they never present the evidentiary tiles to construct the mosaic for Brown's unequal pay claim. *See, e.g.*, [Doc. 48-1 at pp. 6–8]. It is not the Court's burden to comb through extensive records, like this one, to develop arguments in a parties' favor when such arguments should have been presented to the Court for consideration. "The onus is upon the parties to formulate arguments." *A.L. v. Jackson Cty. Sch. Bd.*, 635

F. App'x 774, 787 (11th Cir. 2015) (quoting *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). The Eleventh Circuit Court of Appeals has repeatedly stated that, "[t]o prevail on a particular theory of liability, a party must present that argument to the district court. Our adversarial system requires it; district courts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011) (citation omitted). It is not the district court's job, "especially in a counseled civil case, to create arguments for someone who has not made them or to assemble them from assorted hints and references scattered throughout the brief." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1149 (11th Cir. 2017) (citation omitted).

That said, the *only* references to a "convincing mosaic" theory are couched within Plaintiffs' "discriminatory pay raise" claims—ostensibly, another unequal pay claim for Brown and another unequal pay claim (this time under the description of a "discriminatory pay raise" claim) for Vinson. [Doc. 48-1 at pp. 12–13 (discussing Plaintiffs' discriminatory pay raise claims and asking the Court "to apply the convincing mosaic theory to infer discrimination")].

Looking at the three pay raises between July 2015 to October 2018, Plaintiffs take issue with the fact that Defendants do not even argue that Bass "was more deserving of a bigger raise." [Doc. 48-1 at p. 13].

|  | Bass | Vinson | Brown |
|---|---|---|---|
| July 2015 Salary Increase | $5,054.40 | $83.20 | $41.60 |
| July 2016 Salary Increase | $665.60 | $665.60 | $561.60 |
| October 2018 Salary Increase | $1,830.40 | $1,830.40 | $1,497.60 |

To construct their mosaic, Plaintiffs stress that Bass, because she was a friend of Defendant Tedders' wife, never even applied for the position, but was identified as one of the "top two candidates for the Staff Accountant job." [*Id.* at p. 14]; [Doc. 44-3, McCord Aff., ¶ 13]. Based on this, Plaintiffs blazingly assert that "[t]his undercurrent of nepotism"[15] is "ultimately a form of white privilege" and "pervades this unjust and discriminatory scheme." [Doc. 48-1 at p. 14].

However, these salary increases, as Defendants argue, are not the product of some hidden agenda of invidious race discrimination. In fact, except for the 2015 pay increases mandated by Macon-Bibb County's new pay scale, Brown, Vinson, and Bass each received the exact same percentage raise. So, the only possible claim for a discriminatory pay raise Plaintiffs could make is the 2015 raise where Bass got more than $5000 and Plaintiffs received less than $100.

---

[15] Not only do non-discriminatory differences such as a uniform pay scale readily explain the difference in the raises, but Plaintiffs' allegation of nepotism isn't actionable under Title VII. *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266–67 (11th Cir. 2010) (citing *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir. 1997) (listing nepotism and personal friendship as non-actionable under Title VII)).

As the Court explained earlier, Macon-Bibb County implemented a new pay scale for its employees in 2015. Every employee was assigned a title and a corresponding "position grade" that was then plugged into the pay scale and that generated a salary for the employee. No employee, including Bass, received a salary increase on the basis of their race; rather, each employee received whatever salary related to the specific "position grade" and job title assigned to each employee.[16] *See generally* [Doc. 44-5, McCord Aff.]. And, as far as the 2016 and 2018 pay raises, Defendants "did not award any raises that were not applied equitably to all Accounting Department employees and any perceived pay discrepancy is due to [Plaintiffs and Bass] fulfilling different job duties and responsibilities." [Doc. 44-1 at p. 15]. Plaintiffs just don't have any evidence that Defendants have treated them inappropriately based on their race.

Time and time again, courts dismiss lawsuits where a plaintiff takes issue with an employer's action. However, in the event that it bears repeating, an employer's decisions are not subject to Title VII liability unless the decision was made for discriminatory reasons. Such reasons simply aren't present in this case, and the Court **GRANTS** Defendants' summary judgment motion as to all of Plaintiffs' Title VII claims.

---

[16] It really is as simple and rote as finding an employee's title on a row of a spreadsheet, move to the column that takes into account the employee's "position grade" in the column across the top and the employee gets the salary where the two intersect. Even a federal judge could do this without the help of a law clerk.

34

C.   **Plaintiffs' § 1983 Claims**

Qualified immunity may provide complete protection for public officials sued in their individual capacities. *Willingham v. Loughnan*, 321 F.3d 1299, 1301 (11th Cir. 2003). Following the Court's Order [Doc. 21] on Defendants' Partial Motion to Dismiss [Doc. 10], Plaintiffs' Title VII claims could only be asserted against McCord, as the current tax commissioner, in his official capacity given that individual capacity suits under Title VII are inappropriate. [Doc. 21 at p. 6 (citing *Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991))]. However, Plaintiffs' claims under 42 U.S.C. § 1983 continued against Tedders and McCord in both their individual and official capacities. [*Id.* at pp. 9–19].

With the heavy lifting done, we know that Plaintiffs have no claims under Title VII. And, recalling what *Stallworth* tells us, since Plaintiffs claimed disparate treatment under both Title VII and §§ 1981 and 1983, the legal elements of each claim are identical and need not be analyzed separately. 777 F.2d at 1433; *see also* n.1, *supra*. Consequently, since there is no Title VII violation in this case, there is no § 1983 violation. Therefore, the Court **GRANTS** summary judgment to Defendants on those claims as well.

## CONCLUSION

Based on all of the foregoing, the Court **GRANTS** Defendants' Amended Motion for Summary Judgment [Doc. 44] and **DIRECTS** the Clerk of Court to enter Judgment accordingly and **CLOSE** this case.[17]

---

[17] Defendants' Motion for Summary Judgment [Doc. 36] is **TERMINATED as moot**.

**SO ORDERED**, this 11th day of May, 2020.

S/ Tilman E. Self, III

**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**